## Case No. 9,504.

### The METROPOLIS.

[See Case No. 962.]

METROPOLIS, The (BANKS v.). See Case No. 962.

## Case No. 9,505.

### METROPOLITAN LIFE INS. CO. v. HARPER.

[3 Hughes, 260; 5 Reporter, 490.][1].

Circuit Court, W. D. Virginia. March 20, 1878.

INSURANCE—LIFE—POLICY PAID—SUIT TO RECOVER—FRAUD—COURTS—FEDERAL JURISDICTION—FOREIGN INSURANCE COMPANY—STATE STATUTE.

1. Where the amount of a policy of life insurance has been paid by the insurer, and he afterwards brings suit to recover it back, he must be deemed by the payment to have settled and waived all questions of law and fact, as to the validity of the original contract, except fraud, which they had the means of raising when they paid the loss.

[Approved in Stache v. St. Paul F. & M. Ins. Co., 49 Wis. 96, 5 N. W. 36.]

2. A foreign insurance company may sue as plaintiff in a United States court, regardless of any state law forbidding such foreign companies from resorting to United States courts.

[In equity. Bill by the Metropolitan Life Insurance Company against George W. Harper, on a policy of insurance paid the defendant.]

RIVES, District Judge. This is a suit in chancery, brought for the amount of a life policy paid the defendant under the allegation of a fraudulent procurement thereof. The jurisdiction, therefore, of the court arises out of this alleged fraud. The application and medical examination of the insured took place on the 8th day of July, the policy issued on the 2d August, and the death occurred on the 18th October, all in the same year, 1875. The proofs of death were taken in the succeeding November. They bear on their face the marks of due

care and just precaution. They consist of the statements of the claimant, the attending physician, the undertaker, and the company's resident agent. They display a searching scrutiny into all the facts affecting the liability of the complainant under its contract of insurance. The death was sudden. There had been no such complaint, or known disease beforehand, as would have led to the apprehension of such an instantaneous seizure and death. It was, therefore, well suited to challenge the attention and arouse the suspicions of the company. Could such a sudden death occur without some organic disease, or constitutional infirmity, concealed in violation of that stipulation of the policy, denouncing it null and void, "should any of the statements or declarations made in the application, on the faith of which this policy is issued, be found untrue as regards the age, health, habits, or family history of the insured?" The period of ninety days after due notice and satisfactory proof of death, is reserved to the company for a consideration of the question of its liability under the various warranties it exacts of the insured, of the absolute verity of his answers to their interrogatories. These questions are so numerous and cover such a variety of topics, and in some instances, of such apparent remoteness to the risk, that untrue answers, however immaterial or mistaken, must often be found in practice to furnish a loophole of escape to the insurer. Still the normal requirements of good faith and truth must prevail; and it is not for the insured, or the court that has to pass upon his contract, to shelter him under the plea of the immateriality of the falsehood. He has chosen to contract on the basis of the truth of his answers to all questions; and he has no right to discriminate between them as to their relative weight with his co-contractor. It is scarcely to be supposed that this company was idle in this interval, and failed to make diligent inquiry into all facts touching the payment of the policy. Had they chosen to be thus derelict, it is but just that they should be bound by the consequences of their negligence. But, in my opinion, they are not subject to such an imputation. Look to the questions, with which they ply their resident agent, D. H. Pannill, and his answers. He is asked to state all the facts and circumstances within his knowledge relating to the cause of death. His answer is: "I know nothing of the facts and circumstances attending this death, of my own knowledge. I heard that he died suddenly in Danville, some said of apoplexy, some of heart disease." Again, in answer to the seventh question, as to his knowledge, information, or belief, of any facts inconsistent with the statements made in the application of the insured, he concludes his answer with this significant disclaimer: "I know of no fact why the insured should not have been re-

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. 5 Reporter, 490, contains only a partial report.]

garded as insurable at the time he was insured, and have heard of nothing since, but quite the contrary from all who knew him." This information was given the company by their responsible resident agent under the date of the 16th November, 1875. Should they not have taken alarm at his report of "death from heart disease?" Did not the inquiry naturally arise whether such disease did not antedate the application, and if so, its existence be a breach of its warranties? It is hard to suppose that the four months intervening between these proofs, and the payment of the policy on the 29th March, 1876, passed unimproved by the company in a searching inquiry into all the breaches that are now marshalled in imposing array in the argument of this cause. Is there no legal effect to be attributed to this payment, under these circumstances of delay, and opportunity of inquiry? Notwithstanding this acknowledgment and ratification of the contract, is the case still open in equity for all the defences which the company could have made to an action of law by the defendant to recover of them the amount of this policy? I think not. Reason and authority alike declare that after this payment they are precluded from setting up the warranties, of which they might have availed in their resistance of this payment. The time has passed for such defences. Whether by design or neglect, they have allowed the time to pass within which they could have opened up and relied upon such defences. They have virtually waived them, and are now remitted to the sole defence of fraud. To this effect is the case cited by Mr. Bouldin, of the National Life Ins. Co. v. Minch, 53 N. Y. 144. It was an action brought to recover of the defendant as administrator, etc., of Anna C. Minch, $2500 and interest as damages suffered by the plaintiff by reason of a conspiracy and fraudulent representations, whereby the plaintiff was induced to insure the life of the deceased and to pay the loss after death. It is precisely like the case at bar with this exception, that it was a case at law and triable before a jury; whereas the present is in equity, and to be tried by the chancellor without a jury. The doctrine was there clearly and distinctly announced that a breach of any warranty in an application for a policy of life insurance, must be insisted upon by the insurer, when a claim is made for the execution of the contract, or it will be deemed to have been waived. Mere ignorance of a fact which would have enabled a company to defend on account of such breach is not such mistake of fact as will enable it to recover back money paid upon the policy. In the opinion of the court in this case, this pertinent and comprehensive remark of Judge Sutherland in 27 Barb. 354, is quoted and approved: "In this action they must be deemed by the payment to have settled or waived all questions of law or fact, as to the validity of the original contract, except fraud, which they had the means of raising when they paid the loss."

The doctrine thus clearly stated and commended by its reasonableness to our approval seems to me conclusive of many points raised and discussed by plaintiff's counsel. Such, for instance, is the objection to the appointment and disqualification of the medical examiner. It seems that regularly he is appointed by the general agent, who reports him to the company for confirmation, where I suppose he is duly registered. Whether this is the case where there is a new field for the introduction of this insurance business I am not informed; at any rate the act of the local agent in the appointment becomes known to the company on the issue of the policy, and any irregularity or impropriety therein is the act of the agent, and necessarily waived by the grant of the policy. On this occasion the agent enters on his canvass under the auspices of a resident attorney of the county, to whom the agency was transferred. The insured was a man of respectability and influence; and it was an object with these canvassers to secure him as a patron of their business; accordingly, a friend and neighbor is warmly solicited to aid them in prevailing on the decedent to take a policy in their company. He does so. Under such circumstances of importunity the agent would scarcely agree to be balked in his scheme by the want of a disinterested physician; on the contrary it would not have been surprising if he had improved a medecin malgre lui (a doctor in spite of himself) out of the materials nearest him rather than lose the prize he was in the act of clutching. Nor would it have mattered in law or reason, because his act or fraud would have to go before the company and be repudiated in the rejection, or ratified in the issue of the policy. So, the time for this objection has passed; and whatever irregularity or impropriety there may have been in this selection of the medical examiner, and his conduct of the examination, the company is estopped from availing of it at this time by their accepting the action of their agent in the premises. It is proven that Dr. Robertson did not wish to act; pleaded urgent professional calls upon him at the time, and that the insured also suggested to Dr. Smead, the agent, the impropriety of his acting, as he was a brother-in-law of his, but none of these considerations diverted Dr. Smead from the consummation of the proposals while his recruit was yet in the humor for the contract. Now would it not be a great injustice under these circumstances to allow the company to disavow the knowledge or plead ignorance of these facts; and after the execution of the contract by the issue of the policy to rake up from the past objections that were merged in that policy and obliterated by its grant? I can-

not escape the conclusion that it would be. In the same way, and for the same reason, it is not permissible for the plaintiff's counsel to range through the whole network of interrogatories and rely upon breaches unaffected by fraud. To constitute such fraud, the falsity of the answer is not sufficient of itself; it must be combined with the guilty knowledge of its falsity. Take for instance the answer to the eighteenth question, which has been arraigned by the concluding counsel of the plaintiff as the rankest fraud in the case; the assertion, namely, of the medical examiner that the life proposed was in all respects a first-class healthy risk. This is an opinion still avowed by Dr. Robertson, and I am at a loss to conceive how they should predicate of it, much less prove a knowledge on his part to the contrary, and a fraudulent concealment thereof. So with the answers to questions seven and eight, the truth of which is still averred by Dr. Robertson; and we have no testimony to the contrary at the time of insurance. So far as the testimony discloses, the rheumatic symptoms may have supervened upon the insurance; at the time of the medical report no ailment was spoken of save catarrhal and neuralgic affections; so that fraud cannot fairly be imputed to these answers. And, further, I take it that counsel for the plaintiff have fully conceded that they are restricted to allegations of fraud and cannot now rely on bare breaches of warranty, which were settled, adjusted, and closed forever by the voluntary payment of the loss, though the company were ignorant of the existence of the breaches at the time of such payment. In the same line of argument, much stress is laid on the discharge of the insured from the Confederate army at Norfolk, in 1863, some twelve years prior to the insurance; and although a witness attributes that discharge as well to incompetency as a colonel of militia as to low spirits and enfeebled health. But Dr. Robertson declares that that discharge was not on any grounds affecting longevity, but rather from apprehension of what disease might be developed by the life and exposure of the camp; and it is not just to predicate of his silence on that head, a fraudulent concealment on his part in the absence of all proof that his apprehension of consumption was ever fulfilled by the event, and his positive assertion that the insured was not consumptive.

The bill in this case is framed upon the idea that the plaintiffs would be restricted to the question of fraud. It does not contemplate or ask for relief on the score of breaches of warranty, free from such taint. I admit there is a general sweeping averment of fraud, but it is virtually narrowed to three special instances, which are confined to the answers to three questions, namely: Nos. 10, 11 and 12, and are said to consist in the fraudulent assertion: (1)

"That William H. Harper had never had any illness or injury; (2) that he had never consulted any physician concerning himself; and (3) that he did not use alcoholic stimulants or malt liquors to any daily extent." To these specific charges the pleadings and proofs conform; not so, however, with the argument, which, as I have shown, has taken a wider range.

I must now turn my attention to this aspect of the case. First, however, we must ascertain the current of authorities by which I must steer my course to a decision in this cause. One class is where the applicant, by himself or another, prepares his declaration and solicits his policy. There the courts decide that he is bound by his answers and warrants their truth, so that it is not for him nor the court nor the jury to rely on their immateriality; they are stipulated for as a basis of the contract; the insurer had a right to call for them; and it is for him alone to determine the weight to be given them in his decision upon the grant or refusal of the policy. Nothing but truth in such answers can subserve the ends of morals or law, and uphold the bona fides and justify the execution of the contract. No question here arises as to the obligation of the warranties, for they are not challenged by any testimony dehors the written instrument affecting its purport or validity. Such are the cases of Jeffries v. Life Ins. Co., 22 Wall. [89 U. S.] 47, and Aetna Life Ins. Co. v. France, 91 U. S. 510. But a different rule is applied to the case of local agents who are engaged in the business of soliciting insurance. Where they are active and the insured passive; where they prepare the declarations and dictate the answers, and the respondent accepts them, the courts have refused to enforce against the insured the leading canon of evidence, namely, that a written instrument cannot be varied by parole testimony. But upon the ground that the insurer has, by the act of his agent, secured an advantage which operates as a fraud upon the insured, the latter will be allowed to prove the part of the agent in the framing of his answer, though it tends to invalidate the authenticity of the instrument. This is done under the doctrine of estoppels in pais; a doctrine, as Justice Miller observes, well established and understood, but its applicability not so well defined as could be wished. It has, however, been applied to insurance in numerous well-considered judgments by the courts of this country. Otherwise, the officiousness of insurance agents would defeat the ends of justice and often tend to the support of dishonest claims. To this class belong the cases of Insurance Co. v. Wilkinson, 13 Wall. [80 U. S.] 222; Insurance Co. v. Mahone, 21 Wall. [88 U. S.] 152; Continental Ins. Co. v. Kasey, 25 Grat. 268; Manhattan Fire Ins. Co. v. Weill [Case No. 9,022].

Being thus furnished with the law and the

discriminations made by it, we advance to the facts of this case. It is not my purpose to enter on a critical examination of the voluminous proofs in this cause. I shall indicate my conclusions rather than endeavor to support them by particular references to the testimony. The pleadings in this cause must be given their just weight. This forum allows the complainant to appeal to the conscience of the defendants, and when he has done so, the answers can only be overruled by two witnesses, or one witness with corroborating facts. What, then, briefly is the statement of Dr. Robertson's answer? That he was arrested in the midst of urgent professional calls by Dr. Smead, the agent of the plaintiff, and constrained by his importunity to undertake a task entirely new to him, that of a medical examiner of his brother-in-law, William H. Harper; that he had not time to read the paper or printed forms presented to him, but was directed in his task by the agent, to whom he readily yielded as to one authorized by the company to guide him in filling up the blanks in the printed form. "When in this way he reached question No. 10, respondent stopped, and was going on to mention the illness and injuries which the said W. H. Harper had had, without objection on the part of W. H. Harper, when said Smead said that that question must be answered 'No,' unless such illness or injury had impaired said Harper's constitution or general health; and respondent believing it had not, and believing also that said Smead knew how the said question should be answered so as to meet the requirements of his company, wrote the answer 'No.' When question No. 11 was reached, namely, 'Has the said life ever consulted any physician concerning himself?' respondent asked said Smead if he must answer whether he consulted him, or whether he had consulted any other physician besides himself, and said Smead replied that he must answer whether he had ever consulted any physician besides himself, and that he must answer said question 'No.' When question No. 12 was reached, namely, 'To what daily extent does the said life proposed use alcoholic stimulants or malt liquors?' respondent answered, 'Not at all,' and he claims now that answer was true." Now if this answer could be disproved there is one only living witness who could do so, and that is Dr. Smead. His deposition has been taken and filed by the plaintiff in this cause. I have read it attentively, and can find nothing substantial to contradict or discredit the answer. There are some trivial and circumstantial discrepancies, but a substantial agreement. Dr. Robertson is arraigned for not excluding Smead from the examination, and for not reading the caption of the paper; while Dr. Smead, acting at different times both as agent and medical examiner, pleads as his excuse for his forbidden presence, that he also had not read the caption and was ignorant of its prohibition. This disposition, then, is to be taken as sustaining the answer. Not a suspicion, therefore, is left as to the part of Dr. Smead in dictating the simple answer of "No" to the questions Nos. 10 and 11, and suppressing the explanatory remarks of Dr. Robertson as assented to by W. H. Harper. Can the company, therefore, take advantage of this answer dictated by their agent, and exclude the explanation made by Dr. Robertson? Certainly not, if the decisions of the supreme court that I have cited are to be respected and obeyed. But, say the plaintiff's counsel, give the defendant the benefit of Dr. Robertson's explanations, which were suppressed by Dr. Smead, and still there is a fraudulent concealment of the real state of the insured life. He is confronted by the fact of Harper's discharge from the Confederate army and his spell of sickness in February, 1875. This, of course, depends on the testimony, and the plaintiff assumes the onus of showing the former was due to a consumptive habit, and the latter to a serious organic derangement. It is easy enough with a suspicious turn of mind to conceive and charge such was the case; but with the court it is a question of proof. There has been a diligent search for testimony on this subject; a large number of witnesses have been examined upon it; no pains have been spared to establish it, if it existed; and yet after a careful sifting of the testimony it seems to me there is a plain defect of proof to maintain the issue on the part of the plaintiff. The sum of the testimony is that the discharge from the army was owing to low spirits and depressed health as well as military incapacity; and that the spell of sickness in the winter arose from a temporary derangement of the stomach, from both of which the insured recovered before the insurance in July, 1875. If these indispositions were more serious, I can only say the fact has not been shown to my satisfaction. No one of all these witnesses has been found to testify that the insured was consumptive, or that his health was impaired by organic disease. It is true that he was sick for some eight or ten days in February preceding his demise, but where is the proof that it was otherwise than as described by his physician; a transient affection of the stomach, from which he recovered without any lasting injury. All this diagnosis may be wrong, but where is the proof of it? Parties in interest and third persons may speculate to the contrary, as interest or suspicion may suggest; but the judgment of the court must repose on a surer foundation. It requires proof, and is forbidden to enter the field of conjecture, where fraud is never presumed, but is always to be proved. The same reasoning applies to the habits of the insured as to drink. No witness deposes that he ever saw him drunk or under the influence of liquor. Prior to his sickness he drank ardent spirits occasionally at home and abroad, but no one can be gotten to declare that the habit affected his health or constitution, or that he ever carried it to excess. His indulgences in this way might be exaggerated or lightened, according to the

fancy of the witness; but I infer from the general current of testimony he had been a moderate drinker, and had not in this respect abused or impaired his health or constitution. But after February, 1875, it is indisputably proven that he abjured ardent spirits and addicted himself to the occasional use of wine only. Under this state of proof was Dr. Robertson justified in answering question No. 12: "To what daily extent does the insured use alcoholic stimulants," "Not at all?" I think he was, and I discern in that answer no concealment whatsoever, much less a fraudulent concealment. Thus, then, stands the case with the defendant Dr. Robertson. The insured only acquiesced in these answers, and must be, at least, as free of fraud as he. Both these men stand fair and irreproachable in their communities. I see nothing in this testimony to blast their characters and convict them of fraud. There is no ground to fear that these insurance companies will fail of the protection of the courts and be left exposed by them to the machinations of the fraudulent. They are praiseworthy and beneficent enterprises and will, I doubt not, receive the full protection of the law in all cases of fraud. This is proven by the sequel of the case of Anna C. Minch, which I have quoted. The new trial resulted in the finding of the atrocious fraud alleged, and the recovery of the amount of the policy already paid, with interest and costs. Such, I am sure, would be my judgment in such a case. But it is solely because the fraud is not proved to my satisfaction that I feel constrained to deny the relief asked. Had it appeared to me that W. H. Harper had by himself, or in conspiracy with Dr. Robertson, fraudulently violated any of the warranties on which his policy rested, no such consideration of sympathy as has been hinted would, for a moment, withhold me from the retribution which it would be in my power and will to visit upon such a breach of faith. I am not able to fasten on the deceased the fraud alleged against him. He seems to me to have been the passive recipient of the policy he was solicited to take; and his tacit acceptance of the answers which Dr. Robertson gave for him, under the direction of the agent, are not tainted by falsehood or fraud. Nor does it seem to me that the company have any right to complain that either their agent or medical examiner betrayed their confidence or exceeded their authority. The whole transaction was as fair and honest as the infirmity of human nature admits of. An interested and jealous mind may doubtless discern flaws and lapses in it; but a generous and just construction of motives and acts will, it seems to me, exculpate the parties from the serious charges against them.

In casting around for the cause of this controversy, I can scarcely be mistaken in attributing it to the sudden and remarkable death of the insured. It was well calculated to provoke hostile speculations, and to impugn the accuracy or good faith of the medical report.

In contemplating such a catastrophe, so instantaneous and unaccountable, rumors might well spread that it was due to heart disease, or some organic derangement which Dr. Robertson should have seen in its beginning and reported on his examination. Hence, medical experts have been examined as to this death, and have failed to detect or expose its immediate cause. All of certainty we have on the subject is the theory of his physician that it was the transfer of his neuralgic rheumatism to his heart. At any rate there is an entire absence of proof to show it was owing to a cause existing at the time of the medical examination, was then known to Dr. Robertson, and fraudulently suppressed by him. In Mrs. Minch's case, she was represented to have died of pneumonia, when it was proven she died of cancer, fraudulently concealed in her declaration. How unlike to this case! I have not adverted to the testimony of Dr. Hegeman, the vice-president of this company. It is so largely devoted to the offer and rejection of compromises, all of which is inadmissible as evidence, that it has no special weight in this case. So far as it seeks to impeach the evidence of Dr. Robertson through his conversations and letter exhibited with the deposition, I see nothing that may not be reconciled, and be consistent with the truth of both witnesses.

After a careful and deliberate consideration of the case, I am satisfied it was right to set aside the issue once directed in it. It is emphatically a case of equitable jurisdiction, where the verdict of a jury could scarcely aid the court. Where the credibility of conflicting witnesses is to be passed upon, it is perhaps proper to evoke the verdict of a jury; but in all other cases resting upon the original jurisdiction of a court of equity, it is rarely discreet to devolve the responsibility of a judgment, in whole or in part, upon the finding of a jury. It has been suggested that as this company has contracted, under the terms of the act of assembly, to be amenable to suits in the courts of this state, it forfeits its character of a foreign corporation and its right to sue in this court. This consequence does not seem to me legitimate. It may be bound to appear through its resident agent to suits against it; and when brought its agent may be precluded from removing the case to a federal court, as, I am told, has been decided by our court of appeals. But evidently this act does not pretend to deprive the foreign corporation of its resort, as plaintiff, to this court. Hence, I decline to yield to the claim of the defendant's counsel that I have not jurisdiction of this case.

I have thus hurriedly disposed of the questions raised and discussed in this case with rare ability. It only remains for me to announce my judgment that the bill must be dismissed with costs, and the injunction against the bankers dissolved, so that they may pay the deposits to the defendant, George W. Harper.